## LAWFUL AND UNLAWFUL ACTION BY STRIKERS.

Common Pleas Court of Tuscarawas County.

H. R. BROWN & SON *v.* THE UNITED MINE WORKERS OF AMERICA, ET AL.

Decided July, 1925.

*Lawful Strikes and the Privileges to which Strikers may Resort—Trade Disputes can Occur only between Employer and his Employees—A "Strike" against One not an Employer of the "Strikers" Constitutes a Boycott—Conduct on the Part of Alleged Strikers which Liberty and Law alike Require should be Enjoined.*

1. A "lawful strike" is one carried on by a labor union against a concern between which and members of the union the relation of employer and employees has theretofore existed.

2. The privilege of picketing and persuasion of employees of a given concern to leave their work is limited to a lawful strike, and where exercised against one with whom this relation has not existed constitute a boycott, and affords ground for an injunction at the suit of the one against whom the unlawful acts are being directed.

3. A mining corporation which some years ago employed union labor, but for two or three years has been operating in a small way on the open shop plan, can not upon opening a new property with the purpose of operating it with non-union labor be subjected to a "lawful strike" by the miners union.

4. Moreover assuming that a legitimate trade dispute existed affording ground for a "lawful strike," the privileges attending a lawful strike would not permit surrounding the mine, in which thirty or forty men were at work, by a crowd of from seventy-five to two hundred and fifty on different occasions, who were encouraged by their leaders and indulged in threats, even of death, against the non-union workers, and which caused such fright on the part of some of the workers that they were ready to promise anything if allowed to escape; and where such a situation is presented the rights of property, liberty, and even life, demand protection.

5. The fact that positive testimony has much more probative value than negative, renders impressive the testimony of persons who stated that they saw stones thrown, although met by that of many more who declared, and probably with entire honesty, that they did not see any stones thrown.

*Mr. H. L. N. Stafford,* and *Mr. John .O'Donnell,* for Plaintiff.
*Messrs. Bowers & Bowers,* for Defendants.

REID, J.

The court in reaching its conclusion will not again call attention to the allegations of the petition, but will proceed at once with its reasons for the conclusion reached.

In this application for a temporary injunction we are called upon to determine the rights of the defendants under the facts presented by the evidence measured by the law applicable in such cases.

The right of labor unions to engage in the practice commonly called "picketing" and to indulge in the persuasion of non-union employees to leave their employment is involved to some extent. We think the evidence is undisputed that the difficulties involved in this controversy do not constitute what is commonly known as a "strike." The plaintiff some years ago employed union labor in the operation of coal mines, but never in operating the mines in question in this case. For a period of perhaps two or three years they have operated in a small way on the open shop basis. The trouble seems to have culminated on their acquisition of a new property, which it was proposed to operate with non-union labor. The defendants regardless of the non-existence of any relation as employer and employee with union members, claim the right to exercise the privileges which the law gives them where members of a union are engaged in a "lawful strike."

In the case of *Park* v. *Hotel Employees,* 22nd N. P., new series, page 257, in an opinion rendered by Judge Foran in 1919, a very exhaustive review is made of the question, which we think is involved in this controversy. Judge Foran was one of the ablest jurists of Cuyahoga county. On page 274 he gives a definition of a strike. This was a case considered by him in which the labor union sustained no working relation with the employer, but were seeking to compel recognition by the restaurant involved in the controversy, and was engaged in picketing and resorted to methods held legal under a lawful strike. After giving definitions from the various text

books and other legal authorities upon what a "strike" is, Judge Foran used the following language:

"It will be noticed in all these definitions, and in every definition of a strike that can be obtained, that a strike only results where there is the relation of employer and employee; that is, a strike can only be said to exist where there is a trade dispute between the employer and his workmen. This relation is the essential basis of the local right to maintain and enforce a strike. A strike can not be said to exist where the relation of employer and employees did not exist. Suppose, for instance, a labor union says to a man who employs only non-union labor, "You discharge your men or compel them to join our union," and if he refuses, they proceed to picket his factory, store or place of business and resort to the usual coercive tactics accompanying such picketing. The action of the union is not a strike, but is a boycott. Neither the union or its members has any trade or other relations with the man, no dispute with him, except a dispute created by themselves."

Judge Foran in this opinion gave an exhaustive review of all phases of the law and goes on to say, that it is perfectly proper for the members of a labor union themselves to advise their own members not to work, so far as the membership of the union is concerned. It does not assume the illegal aspect of a conspiracy to injure the person so long as the withdrawal of support is confined to their own members. If, however, union labor or other recognized organizations influence others not members of the organization, and the public generally not to trade with or have business relations with the person against whom the boycott is directed, then the boycott becomes an illegal conspiracy and will be enjoined.

I will call your attention to a more recent opinion of the Supreme Court by Florence Allen, in the 108th O. S., page 61, in the case of *LaFrance Electrical Supply Company* v. *Brotherhood of Electrical Workers No. 8*. At the termination of a contract with the union employees, the employer stated that he was going to operate on a different basis of employment and solicited the union members, who had been working for him to sign individual contracts which permitted him to employ union, as well as non-union labor. The employer set up

the claim that the relation of employer and employee did not exist, the contract having terminated, and that he should, therefore, be permitted to enter into this method, which was legal, and that no trade dispute existed, and that for this reason picketing was illegal.  The lower courts, and also the Supreme Court, held in this case that a trade dispute did exist and that while technically the contract of employment had terminated, that, inasmuch as, the employers solicited the members of the union who had been in their employ before, and many of them had signed individual contracts to continue work, that a trade dispute did exist.

In our opinion the court by very strong inference points out the conditions where picketing and persuasion may be employed, and that these are limited to a strike growing out of a legitimate trade dispute.  The court speaking with approval of the decisions of other courts, at page 84 of the opinion uses this language:

"A long line of authority in the lower tribunals, which includes decisions of outstanding judges in the nisi prius courts in this state, hold that in the prosecution of a strike, that is, a refusal of employees to work owing to a legitimate trade dispute with their employers, workingmen may legally place pickets or patrols within a reasonable distance of the employer's place of business for the purpose of observing the progress of the strike.  These decisions have been acquiesced in in this state for almost twenty-five years, the period during which industrial strife has become most prominent.  It is also generally held by the same Ohio lower courts that striking workmen may peacefully persuade men and women still working under their former employer to abstain from working for the employer during the continuance of such strike, and may peaceably persuade new workmen not to accept employment."

It seems clear that the courts have never extended this extraordinary privilege to workmen to engage in picketing only in case of what is termed a "lawful strike."

The writing admitted in evidence, which was signed some years ago by plaintiffs will not alter these rules.  Whatever moral obligation this promise to never employ non-union labor,

may impose would not give it the force of a trade dispute. It covers no specific period of time and it probably violates the Valentine anti-trust law of the state; and if so is made void by statute. It has not been regarded or followed for several years. If a liability to the defendants ever accrued on account of this writing it would have to be enforced through legal proceedings and not by the methods employed under the circumstances in this case.

If we are correct in our interpretations of the law, then these defendants were without right to engage in the picketing or persuasion of the employees to stop work for the purpose of injuring the plaintiff's business, or compelling them to employ union labor. But if it be conceded that the defendants have all the rights that a legitimate trade dispute gives them, then what is their situation under the facts of this case?

Referring to the recent decision on the LaFrance case 108th O. S., and reading from the bottom of page 86:—

"What peaceable picketing is under the law in this state depends upon the circumstances of the case. The number of pickets is not conclusive, nor can any special rule be laid down in detail to define peaceable picketing. This much is established. Picketing in such numbers as to prevent free access to the plant of the employer, or in itself to constitute a threat of physical force, is unlawful. Acts or threats, direct or indirect, made by pickets to workmen employed by their former employees, or to their families, which tend to amount to coercion or duress, or tend to substitute the will of the strikers for the will of those whom they approach in persuading employees to leave their work or in inducing others not to seek employment with the strikers' former employer, are unlawful and subject to injunction.

"The injunction of the court in this case prohibits all forms of picketing, except peaceful picketing, prohibits all violence, abuse, congregation in numbers in excess of three, and actually restrains certain defendants from acting as pickets under any circumstances. This court finds no error in the judgment of the court of common pleas upon this branch of the case."

In an opinion by Judge Oppenheimer, *Fulworth Co.* v. *Garment Workers*, 15th N. P., new series, page 360, this language is used:

"Picketing need not be accompanied by force to be unlawful. If it be conducted merely with the design to hinder or obstruct the new employees or others, or to convey the idea that compliance with the strikers' request will be advisable, or if it be calculated to intimidate the weak and fearful, it is as much unlawful as though it were accompanied by physical force. And so if the purpose of maintaining a picket is to procure workmen to break contracts of employment, it will be unlawuful even though conducted in a peaceable manner."

Reading again from page 363 of the same opinion:

"A person's business is his property and he is entitled to protection from unlawful interference therewith. Every person has a right to carry on his legal business according to his own discretion, and to employ therein any means which are safe, healthful and lawful and to employ such persons as he may select; and it is the duty of all other persons to refrain from obstructing any party in the exercise of these rights."

Applying these rules of law, to the evidence developed on the witness stand, what would be the situation of the defendants under the law, even if they had a right to pursue the methods which the law extends to union labor if a lawful strike is being conducted.

Take for instance the small number of non-union employees in these mines at this time, thirty to forty, and yet, on a number of occasions from seventy-five to two hundred and fifty, the evidence shows, have been congregating upon these grounds and upon the public highway and in the vicinity of the premises to conduct what they term "lawful picketing." There is some dispute in the evidence as to whether any threats were made by union members. Several witnesses have testified as to threats of death to the plaintiffs and that workmen were intimidated by threats, which is denied by some of the witnesses offered by the defendants. Consider the testimony of Mr. Price himself. We will say that Mr. Price does not impress the court as a man who would want to commit depredations or violate the laws, but he is so enthusiastic about the cause that he represents and so interested in the many people whose hearts and minds are devoted to labor union ideals, that under

the stress and excitement of the moment, he unconsciously overreaches the limits of the law, even if it had been a lawful strike.  For instance, take his remarks contained in his speech and from his view point they were perfectly innocent; yet it must be conceded that in that speech and in Mr. Price's own testimony as to his remarks in creating a situation that would put these plaintiffs to the expense of twenty armed guards, and that the financial distress thus created would break them up, that it was all right, had a tendency to incite his followers to unlawful acts and words.  The large numbers present and the threatening attitude of members of the union, followed by acts of violence in throwing stones and intimidating workmen, prove that the effect of the remarks of Mr. Price went beyond the measure of the law.  It is not the idea of this court that where there are twenty-five to thirty-five men employed, that seventy-five to two hundred men would be a lawful committee for duties of peaceful persuasion in advising non-union laborers whether or not they were pursuing the right course in working for this employer under the existing conditions.

There could be but one real purpose of the large numbers, and that was the result which the evidence shows naturally followed.  One of the witnesses for the defendant who assisted in extricating some of these workers from the ditch where they had driven their automobiles in attempting to escape, said they were scared so bad that they were ready to promise most anything—that they promised never to come back to that mine again.  The effect of the large numbers was enough to produce this result, even if no threats were made.  The stone throwing and the large numbers engaged therein, under the opinion of the Supreme Court of the state of Ohio, quoted, would be unlawful picketing, even if a lawful strike existed.

One young man employee, who gave the names of members of the union who called at his home, and heard them tell his father-in-law, in substance, that he would be given burial in canal water if he continued with this company, says that he quit work on account of these threats.

It must be admitted that whatever a portion of these members

did at these meetings, it was the concerted action of all of them, with their leader Mr. Price present with them in some of the instances. To a court guided by the law, it constitutes a conspiracy, and was unlawful in that threats were made and the large numbers engaged therein put it beyond the pale of lawful picketing or of peaceful persuasion, and the court would have but one duty that it could under its oath perform, and that would be to enjoin. Justification is sought by claiming that guards employed by plaintiff were guilty of unlawful acts. Suppose they are guilty of crimes that merit the action of the grand jury, that would not relieve the members of the union, in a court of equity, from being required to observe the laws.

There has been considerable testimony to show that rocks were thrown, and this was negatived by witnesses for the defense. In instances of this kind positive testimony has much more force than negative, for the reason that in the large number of those present, many may not have seen the act done and could testify accordingly and be honest about it; but the positive testimony of a witness who did see the weapon thrown, would have a much more probative value than the negative could produce.

The court deeply regrets disputes of this character. Especially at this restless period, the court would be without heart if it did not sympathize with the distress and want, existing because of the many whose business it is to mine coal from the earth being idle and without work. But here are involved serious questions of law that must protect life that must protect liberty, that must protect property and civilization itself. It is paramount that we all conduct ourselves in keeping with organized order. Organized order is law. The duty of the court is to determine and apply the law as it exists. A temporary restraining order will be granted as prayed for in the petition. Bond of five hundred dollars declared sufficient under the statute.